UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

**DONALD REED**, individually and on behalf of all others similarly situated,

Plaintiff,

v.

**KALAHARI MANAGEMENT CO., LLC**,

Defendant.

Civil Action No.

**JURY TRIAL DEMANDED**

# CLASS ACTION COMPLAINT

Plaintiff Donald Reed ("Plaintiff"), individually and on behalf of a proposed class of similarly situated persons, sues Defendant Kalahari Management Co., LLC ("Kalahari" or "Defendant"). Allegations about Plaintiff rest on Plaintiff's personal knowledge. All other allegations rest on the investigation of Plaintiff's counsel and on information and belief.

## I. INTRODUCTION

1. Kalahari, the management company for the Kalahari Resorts & Conventions chain of indoor waterpark resorts and convention centers, collected and kept the Social Security numbers and other personally identifiable information ("PII") of its guests and employees. It did not protect that data. On October 9, 2026, an unauthorized actor accessed Kalahari's network.

2. The ransomware group Inc Ransom has claimed responsibility, posting on its data leak site that it took more than 2.3 million files from 18 Kalahari corporate servers, including employee and guest data, and that it will release the data progressively (the "Data Breach").[1]

[1] *Inc Ransom*, RansomLook, https://www.ransomlook.io/group/inc%20ransom (last visited Nov. 16, 2026).

3. The intruders reached Kalahari's data because Kalahari left its network servers inadequately defended. The theft of guest and employee Social Security numbers was a known and foreseeable risk for a company holding this volume of sensitive personal data.

4. Kalahari has said little. It detected the intrusion on October 9, 2026, and determined on October 16, 2026, that personal information may have been affected, but waited until October 30, 2026, to begin notifying affected individuals. Its notice letter, a sample of which Kalahari submitted to the California Attorney General, states that names, addresses, dates of birth, and Social Security numbers were involved, but it does not explain how the intruder gained access or how long it remained in Kalahari's network.[2]

5. Kalahari's choices caused this harm. It chose not to adopt reasonable safeguards, not to follow appropriate protocols for encrypting sensitive data, and not to tell its guests and employees promptly once the data was gone.

6. Plaintiff's and Class Members' PII now sits with criminals. They face a real and imminent risk of fraud and identity theft that may follow them for life, and they must now spend their own time and money guarding against it.

7. Plaintiff brings claims for negligence, negligence per se, breach of implied contract, unjust enrichment, and declaratory relief. Plaintiff seeks damages and an injunction requiring Kalahari to fix its data security and to provide Class Members with at least ten years of credit monitoring and theft protection.

---

[2] Kalahari Mgmt. Co., LLC, *Notice of Data Breach* (Oct. 30, 2026), https://oag.ca.gov/system/files/Kalahari%20Notification%20Letter%20%28CA%29_Redacted.pdf [hereinafter *Kalahari Notice*] (sample notice submitted to Cal. Att'y Gen.).

## II. PARTIES

8. Plaintiff Donald Reed is an adult who, at all relevant times, resided in and was a citizen of the Commonwealth of Pennsylvania. Plaintiff was a Kalahari employee until approximately October 2026, and provided Kalahari with his PII, including his Social Security number, in connection with his employment. Plaintiff Reed received Kalahari's October 30, 2026 notice letter informing him that his PII was compromised in the Data Breach.

9. Because of the Data Breach, Plaintiff has suffered concrete injury, including: a marked increase in spam communications received; time spent reviewing and monitoring account and credit statements; stress and worry regarding the security of his PII, including his Social Security number; loss of the value of Plaintiff's PII; and loss of privacy.

10. Because of the sensitivity of the stolen data, Plaintiff remains at substantial and imminent risk of identity theft and fraud for years to come.

11. Defendant Kalahari Management Co., LLC is a Wisconsin limited liability company with its principal place of business at 1305 Kalahari Drive, Wisconsin Dells, Wisconsin 53965.

## III. JURISDICTION AND VENUE

12. This Court has subject-matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2)(A). The proposed Class exceeds 100 members, the aggregate amount in controversy exceeds $5,000,000 exclusive of interest and costs, and at least one Class Member is a citizen of a state different from Defendant.

13. The Court has personal jurisdiction over Kalahari because Kalahari is organized under Wisconsin law and maintains its principal place of business in Wisconsin, and because a substantial part of the conduct at issue occurred in this District.

14. Venue is proper under 28 U.S.C. § 1391 because Kalahari resides in this District and a substantial part of the events and omissions giving rise to the claims occurred here.

## IV. FACTUAL ALLEGATIONS

### A. Kalahari Collected and Kept Its Guests' and Employees' Most Sensitive Data

15. Kalahari is the management company for Kalahari Resorts & Conventions, a chain of indoor waterpark resorts and convention centers offering waterparks, dining, spas, family entertainment centers, and convention space.[3]

16. Plaintiff and Class Members are current and former Kalahari guests and employees. As a condition of employment or of receiving resort services, Kalahari required them to provide their PII, including Social Security numbers.

17. Plaintiff and Class Members guard the confidentiality of their PII and took reasonable steps to keep it private. When they gave their PII to Kalahari, they reasonably expected Kalahari to protect it.

18. By collecting and storing this PII, Kalahari took on legal and equitable duties to secure it, to use it only for legitimate business purposes, and to disclose it only with authorization.

19. Kalahari did not meet those duties. Its inadequate security allowed criminals to enter its systems and remove Plaintiff's and Class Members' PII.

### B. The Data Breach

20. On October 9, 2026, Kalahari detected unauthorized access to its network environment. On October 16, 2026, Kalahari determined that personal information may have been

[3] *About Us*, Kalahari Resorts & Conventions, https://www.kalahariresorts.com/about-us/ (last visited Nov. 16, 2026).

affected. The compromised data includes names, addresses, dates of birth, and Social Security numbers. Inc Ransom has claimed responsibility and has threatened to release the stolen data.[4]

21. The attack was aimed at, and succeeded in obtaining, the confidential personal data of specific individuals, including Plaintiff and Class Members.

22. Kalahari waited until October 30, 2026, three weeks after it detected the intrusion, to begin sending notice letters to affected individuals.[5] Even then, it did not explain how the intruder gained access, how long it remained in Kalahari's network, or what the Data Breach means for its guests and employees.

23. The Data Breach was the direct result of Kalahari's failure to adopt and follow basic security procedures for the PII of its current and former guests and employees.

**C. Stolen PII Is Valuable to Criminals and Harmful to Victims**

24. Kalahari knew that the PII it held was highly sensitive, was valuable to criminals, and would expose its guests and employees to identity theft and fraud if stolen. Large, well-publicized breaches at Equifax, Marriott, Anthem, Yahoo, and others made that risk plain.

25. Other high-profile breaches put Kalahari on further notice, including those at Microsoft (250 million records, December 2019), Wattpad (268 million records, June 2020), Facebook (267 million users, April 2020), T-Mobile (77 million records, August 2021), AT&T (over 100 million records, March and July 2024), Ticketmaster (560 million records, May 2024), PowerSchool (62 million records, December 2024), Conduent (17 million records, January 2025), and Aflac (23 million records, June 2025). Kalahari knew, or as a reasonable business should have known, that the PII it collected and maintained would be targeted by cybercriminals.

---

[4] *Kalahari Notice*, *supra* note 2; *Inc Ransom*, *supra* note 1.

[5] *Kalahari Notice*, *supra* note 2.

26. Cyberattacks have become so common that the FBI and U.S. Secret Service have warned potential targets to prepare for and thwart them.[6] The rise in such attacks, and the attendant risk of future attacks, was widely known to the public and to Kalahari.

27. Stolen PII is easy to sell. Anonymous dark web forums function as active marketplaces for it.[7]

28. The Federal Trade Commission warns that identity thieves use stolen personal data to commit identity theft and financial and medical fraud.[8]

29. Federal regulations define identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[9] "Identifying information" includes a person's name, Social Security number, and date of birth,[10] which are the very categories of data compromised in the Data Breach.

30. The link between a data breach and identity theft is simple and well established. Criminals steal personal data to monetize it, either by using it themselves or by selling it on the black market to other criminals, who then use it to commit identity theft and related crimes.

31. The dark web is an unindexed layer of the internet that requires special software or authentication to access. It offers anonymity to visitors and website publishers, and its users must

---

[6] Ben Kochman, *FBI, Secret Service Warn of Targeted Ransomware*, Law360 (Nov. 18, 2019), https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware.

[7] Brian Krebs, *The Value of a Hacked Company*, Krebs on Security (July 14, 2016), https://krebsonsecurity.com/2016/07/the-value-of-a-hacked-company/.

[8] Fed. Trade Comm'n, *What to Know About Identity Theft* (Sept. 2024), https://consumer.ftc.gov/articles/what-know-about-identity-theft.

[9] 16 C.F.R. § 603.2(a).

[10] *Id.* § 603.2(b)(1).

know a site's address in advance, which prevents dark web marketplaces from being easily monitored by authorities or accessed by outsiders.

32. A sophisticated black market exists on the dark web where criminals buy and sell malware, firearms, drugs, and, frequently, personal information like the PII at issue here.[11] Stolen PII lends itself to these transactions because it can be transmitted instantly over the internet while buyer and seller remain anonymous. Criminals can readily purchase stolen financial information, account login credentials, Social Security numbers, and dates of birth.[12]

33. Breaches keep growing. In 2024, 6,670 breaches exposed more than 16.8 billion records, a 6% increase over 2023.[13] Total consumer reports to the FTC, including fraud and identity theft reports, roughly doubled from 3.2 million in 2019 to 6.5 million in 2024, and 2024 saw the second-highest count of U.S. data compromises since tracking began in 2005.[14]

34. A 2022 poll of security executives predicted more social-engineering and ransomware attacks over the following two years, with the main causes being misconfigurations, human error, poor maintenance, and unknown assets.[15] Attackers also increasingly use artificial

---

[11] Off. of the Inspector Gen., U.S. Dep't of Just., *DOJ OIG Releases Report on the FBI's Strategy and Efforts to Disrupt Illegal Dark Web Activities* (Dec. 17, 2020), https://oig.justice.gov/news/doj-oig-releases-report-fbis-strategy-and-efforts-disrupt-illegal-dark-web-activities.

[12] Louis DeNicola, *What Is the Dark Web?*, Experian (May 12, 2021), https://www.experian.com/blogs/ask-experian/what-is-the-dark-web/.

[13] Flashpoint, *2025 Global Threat Intelligence Report* (Mar. 18, 2025), https://go.flashpoint.io/2025_GTIR.

[14] Ins. Info. Inst., *Facts + Statistics: Identity Theft and Cybercrime*, https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime (last visited Nov. 9, 2026).

[15] Chuck Brooks, *Alarming Cyber Statistics for Mid-Year 2022 That You Need to Know*, Forbes (June 3, 2022), https://www.forbes.com/sites/chuckbrooks/2022/06/03/alarming-cyber-statistics-for-mid-year-2022-that-you-need-to-know/.

intelligence: 2,130 AI-related vulnerabilities were disclosed in 2025 alone, a 34.6% year-over-year increase, and 16% of 2025 breaches involved attackers using AI.[16]

35. The harm from a breach lasts. The U.S. Government Accountability Office has found that thieves may hold stolen data for a year or more before using it, and that once data is sold or posted online, fraudulent use can continue for years.[17]

36. Criminals combine data from multiple breaches into detailed identity profiles and reuse them across many fraud schemes, so exposure of sensitive identifiers is only the start of a victim's problems.[18]

37. Even without financial account numbers, stolen PII enables targeted "spear phishing," in which criminals use a victim's real name, contact details, and affiliations to win trust and extract more information. Spear phishing makes up only 0.1% of email-based attacks but is responsible for 66% of all breaches.[19]

38. Because a person's identity is like a puzzle with many pieces, the more accurate data an identity thief has about a person, the easier it is to assume that person's identity or to target the person for further attacks. Armed with just a name and date of birth, a thief can use "social engineering," manipulating victims through spam calls, text messages, or phishing emails, to

---

[16] Trend Micro, *Fault Lines in the AI Ecosystem: TrendAI State of AI Security Report* (Mar. 3, 2026), https://www.trendmicro.com/vinfo/us/security/news/threat-landscape/fault-lines-in-the-ai-ecosystem-trendai-state-of-ai-security-report; IBM, *Cost of a Data Breach Report 2025* (July 2025), https://www.ibm.com/reports/data-breach.

[17] U.S. Gov't Accountability Off., GAO-07-737, *Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown* (2007), https://www.gao.gov/assets/gao-07-737.pdf.

[18] Matt Cullina, *Small Breaches, Big Consequences*, Forbes (June 10, 2026), https://www.forbes.com/councils/forbesbusinesscouncil/2026/06/10/small-breaches-big-consequences/.

[19] Anne Campbell, *Report: 2023 Spear-Phishing Trends*, Barracuda Blog (May 24, 2023), https://blog.barracuda.com/2023/05/24/2023-spear-phishing-trends.

obtain more information, such as login credentials or a Social Security number. Data breaches are often the starting point for these targeted attacks.

39. With a victim's name and Social Security number, identity thieves can also obtain a driver's license or identification card in the victim's name but with the thief's picture, obtain government benefits, or file a fraudulent tax return. They may also obtain a job using the victim's information, rent a house or receive medical services in the victim's name, and even give the victim's information to police during an arrest, resulting in a warrant issued in the victim's name.[20]

40. Criminals also assemble stolen data into "Fullz" packages.[21] By cross-referencing stolen PII with data available elsewhere, criminals build complete dossiers on individuals. Even if the Data Breach did not expose a victim's email address or phone number, criminals can link the stolen PII to those identifiers and sell the resulting package, again and again, to other criminals, including illegal and scam telemarketers.

41. A breached company is a likely repeat target. Hackers who find an organization vulnerable keep trying to breach its network, and 95% of organizations surveyed by IBM between

---

[20] Soc. Sec. Admin., *Identity Theft and Your Social Security Number* 1 (2018), https://www.ssa.gov/pubs/EN-05-10064.pdf.

[21] "Fullz" is fraudster slang for a complete set of a victim's information, which may include the victim's name, address, credit card information, Social Security number, and date of birth. The more information a criminal has on a victim, the more money the credentials can bring; Fullz can command up to $100 per record or more on the dark web. Fullz can be "cashed out" in various ways, including by performing bank transactions over the phone with the required authentication details in hand. Even "dead Fullz," which are associated with credit cards that are no longer valid, can be used for tax refund scams, to order credit cards in the victim's name, or to open a "mule account" that accepts fraudulent money transfers without the victim's knowledge. *See, e.g.,* Brian Krebs, *Medical Records for Sale in Underground Stolen from Texas Life Insurance Firm*, Krebs on Security (Sept. 18, 2014), https://krebsonsecurity.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm/.

March 2022 and March 2023 reported more than one data breach.[22] About two-thirds of companies hit by a cyberattack are hit again within a year, and it can take an average of 277 days to identify and contain a breach, during which the attacker's point of entry stays open to others.[23]

42. The types of data taken in the Data Breach, including Social Security numbers, are particularly valuable to thieves and leave Plaintiff and Class Members especially vulnerable to identity theft, tax fraud, medical fraud, and credit and bank fraud. Kalahari knew or should have known this and should have protected the data accordingly.

**D. Kalahari Ignored FTC Data Security Standards**

43. Section 5 of the FTC Act, 15 U.S.C. § 45, bars unfair or deceptive acts or practices in commerce. The FTC treats a company's failure to maintain reasonable security for consumers' sensitive data as an unfair practice and has brought enforcement actions on that basis.

44. The FTC's published guidance tells businesses to factor security into decision-making in every department of their business.[24] Among other steps, the FTC directs businesses to: know every connection to systems holding sensitive data and assess each for foreseeable attacks; keep sensitive data off internet-connected machines unless necessary; disable unneeded network

---

[22] Beth Stackpole, *MIT Report Details New Cybersecurity Risks*, MIT Sloan Sch. of Mgmt. (Apr. 30, 2024), https://mitsloan.mit.edu/ideas-made-to-matter/mit-report-details-new-cybersecurity-risks.

[23] Neil Clauson, *When Cyberattackers Strike Again—and Again*, Mimecast (Nov. 13, 2024), https://www.mimecast.com/blog/when-cyberattackers-strike-again----and-again/.

[24] Fed. Trade Comm'n, *Start with Security: A Guide for Business* (Aug. 2023), https://www.ftc.gov/system/files/ftc_gov/pdf/920a_start_with_security_en_aug2023_508_final.pdf.

services; secure web applications; use firewalls and periodically reviewed access controls; watch incoming traffic for intrusion attempts; and watch outgoing traffic for unusual data transfers.[25]

45. The FTC also advises businesses to keep PII no longer than needed, limit access to it, require strong passwords, use industry-tested security methods, monitor for suspicious activity, verify the security of third-party vendors, deploy intrusion detection, and keep a breach response plan ready.[26]

46. Kalahari did not follow these standards. Given the volume of guest and employee PII it held as the operator of a chain of resorts and convention centers, Kalahari knew both its obligations and the consequences of failing them. Its failure to use reasonable measures is an unfair practice under Section 5.

**E. Kalahari Failed to Prevent, Detect, or Disclose the Breach**

47. Kalahari did not take the precautions needed to keep intruders out of its systems, even though the data it held was a predictable target.

48. Data breaches are preventable.[27] As one data security treatise explains, "[i]n almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of appropriate security solutions."[28] "[O]rganizations that

---

[25] Fed. Trade Comm'n, *Protecting Personal Information: A Guide for Business* (Oct. 2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

[26] *Id.*

[27] Lucy L. Thompson, *Despite the Alarming Trends, Data Breaches Are Preventable*, *in Data Breach and Encryption Handbook* (Lucy L. Thompson ed., 2012).

[28] *Id.* at 17.

collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised . . . ."[29]

49. "Most of the reported data breaches are a result of lax security and the failure to create or enforce appropriate security policies, rules, and procedures. . . . Appropriate information security controls, including encryption, must be implemented and enforced in a rigorous and disciplined manner so that a data breach never occurs."[30]

50. Kalahari never told its guests and employees that its systems and security practices were inadequate to protect their PII.

51. Prompt notice lets breach victims protect themselves. Plaintiff and Class Members still do not know exactly what was taken, how it was taken, where their data has gone, or what Kalahari is doing to prevent a recurrence.

**F. Plaintiff and Class Members Have Been Harmed**

52. Once PII is exposed, it cannot be fully recovered or secured against future misuse. Plaintiff and Class Members must stay vigilant for years, possibly for life, and their PII has lost value.

53. PII commands real prices on the dark web. Bank account details sell for roughly $30 to $4,255, and "fullz" bundles of complete identity data are widely available.[31]

---

[29] *Id.* at 28.

[30] *Id.*

[31] Ben Luthi, *Here's What Your Data Sells for on the Dark Web*, Experian (June 30, 2025), https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/.

54. Breach exposure and identity theft go together: government data show that identity theft victims (24%) were twice as likely as non-victims (11%) to learn in the prior year that an entity holding their personal information had been breached.[32]

55. Identity theft victims suffer both direct and indirect financial losses. As the Department of Justice explains:

> A direct financial loss is the monetary amount the offender obtained from misusing the victim's account or personal information, including the estimated value of goods, services, or cash obtained. It includes both out-of-pocket loss and any losses that were reimbursed to the victim. An indirect loss includes any other monetary cost caused by the identity theft, such as legal fees, bounced checks, and other miscellaneous expenses that are not reimbursed (e.g., postage, phone calls, or notary fees). All indirect losses are included in the calculation of out-of-pocket loss.[33]

56. According to the FBI's Internet Crime Complaint Center, internet-enabled crimes reached their highest number of complaints and dollar losses in 2019, resulting in more than $3.5 billion in losses to individual and business victims.[34]

57. Identity theft victims also often suffer embarrassment, blackmail, or harassment in person or online, along with financial losses from fraudulently opened or misused accounts. Beyond out-of-pocket costs that can exceed thousands of dollars, and the emotional toll, victims must spend considerable time repairing the damage: correcting fraudulent information in their credit reports, continuing to monitor those reports, closing existing accounts and opening new ones, and disputing charges with creditors.

---

[32] Erika Harrell, Bureau of Just. Stat., U.S. Dep't of Just., *Data Breach Notifications and Identity Theft, 2021* (Jan. 2024), https://bjs.ojp.gov/document/dbnit21.pdf.

[33] Erika Harrell, Bureau of Just. Stat., U.S. Dep't of Just., *Victims of Identity Theft, 2018*, at 9 (Apr. 2021), https://bjs.ojp.gov/content/pub/pdf/vit18.pdf.

[34] Fed. Bureau of Investigation, *2019 Internet Crime Report Released* (Feb. 11, 2020), https://www.fbi.gov/news/stories/2019-internet-crime-report-released-021120.

58. Because of this recognized risk, a reasonable person whose data is exposed in a breach is expected to spend time learning about the breach and taking steps to reduce the risk of identity theft and fraud. Failing to take those steps could expose the person to greater financial harm, yet the time spent taking them is itself lost.

59. Plaintiff and Class Members have spent, and will continue to spend, time on prudent steps such as placing credit freezes and fraud alerts, contacting financial institutions, closing or modifying financial accounts, changing passwords, and reviewing credit reports and accounts for unauthorized activity. These steps track the FTC's recommendations for breach victims, which include placing a fraud alert (and considering an extended fraud alert, which lasts seven years, if someone steals their identity), reviewing credit reports, contacting companies to remove fraudulent charges, placing a credit freeze, and correcting credit reports.[35]

60. PII is a valuable property right.[36] Its value is evident from the importance of data to modern commerce and from the heavy prison sentences imposed for cybertheft. As a former FTC Commissioner put it, "Data is currency. The larger the data set, the greater potential for analysis and profit."[37] Individuals also value the privacy of their data: research shows that "when privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[38]

---

[35] *See* Fed. Trade Comm'n, *IdentityTheft.gov*, https://www.identitytheft.gov/Steps (last visited Nov. 16, 2026).

[36] *See, e.g.,* John T. Soma et al., *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets*, 15 Rich. J.L. & Tech. 11, at *3–4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets." (citations omitted)).

[37] Pamela Jones Harbour, Comm'r, Fed. Trade Comm'n, Remarks Before FTC Exploring Privacy Roundtable (Dec. 7, 2009), http://www.ftc.gov/speeches/harbour/091207privacyroundtable.pdf.

[38] Janice Y. Tsai et al., *The Effect of Online Privacy Information on Purchasing Behavior: An Experimental Study*, 22 Info. Sys. Rsch. 254, 254 (2011).

61. A legitimate marketplace for personal information also exists. In 2019, the data brokering industry was worth roughly $200 billion.[39] Consumers can sell their non-public information directly to data brokers, who aggregate it and provide it to marketers or app developers.[40] Consumers who agree to share their web browsing history with the Nielsen Corporation can receive up to $50 a year.[41]

62. Because of the Data Breach, Plaintiff's and Class Members' PII, which has inherent value in both legitimate and black markets, has been damaged and diminished in value by its unauthorized and likely release onto the dark web. That transfer of value occurred without any compensation to Plaintiff or Class Members, and the PII has lost its rarity, further reducing its value.

63. Plaintiff and Class Members have suffered and will continue to suffer: out-of-pocket costs for credit monitoring, credit freezes, and similar protection; lost time spent mitigating the breach; theft and lost value of their PII; imminent risk of fraud and identity theft; emotional distress; and ongoing risk to the PII that remains on Kalahari's systems.

64. Kalahari's offer of 12 months of single-bureau credit monitoring is insufficient to make Plaintiff and the Class whole. Nothing it has done accounts for the years of risk victims face or compensates them for the theft of their data.

65. Given the targeted nature of the attack, the types of PII involved, and Inc Ransom's threat to release the stolen data, there is a strong probability that the stolen PII has been or will be

---

[39] David Lazarus, *Column: Shadowy Data Brokers Make the Most of Their Invisibility Cloak*, L.A. Times (Nov. 5, 2019), https://www.latimes.com/business/story/2019-11-05/column-data-brokers.

[40] *See* Datacoup, https://datacoup.com/ (last visited Nov. 16, 2026); *What Is digi.me?*, digi.me, https://digi.me/what-is-digime/ (last visited Nov. 16, 2026).

[41] *Frequently Asked Questions*, Nielsen Computer & Mobile Panel, https://computermobilepanel.nielsen.com/ui/US/en/faqen.html (last visited Nov. 16, 2026).

offered for sale on the dark web to criminals who intend to use it to commit identity theft, such as by opening bank accounts in victims' names, filing false tax returns, taking out loans, or filing false unemployment claims.

66. That fraud may go undetected for months or years. Victims often learn of it only when debt collection calls begin, when law enforcement notifies their employer of a fraudulent unemployment claim, or when their authentic tax return is rejected.

67. The PII exposed here is also far more valuable than, for example, credit card information stolen in a retail breach, which victims can cancel and replace.[42] Social Security numbers and dates of birth cannot be "closed" and are difficult, if not impossible, to change.

68. The retail cost of credit and identity theft monitoring can be $200 or more per year for each Class Member. That is a reasonable and necessary cost to protect Class Members from the risk of identity theft created by the Data Breach, and one they would not bear but for Kalahari's failure to safeguard their PII.

## V. <u>CLASS ACTION ALLEGATIONS</u>

69. Plaintiff brings this action individually and on behalf of a class under Federal Rule of Civil Procedure 23, defined as:

> All individuals in the United States whose PII was compromised in the Data Breach (the "Class"), including all individuals who received notice of the Data Breach from Defendant.

70. The Class excludes Kalahari; its subsidiaries, affiliates, officers, and directors; any entity in which Kalahari holds a controlling interest; the legal representatives, heirs, successors,

---

[42] *See* Jesse Damiani, *Your Social Security Number Costs $4 on the Dark Web, New Report Finds*, Forbes (Mar. 25, 2020), https://www.forbes.com/sites/jessedamiani/2020/03/25/your-social-security-number-costs-4-on-the-dark-web-new-report-finds/.

and assigns of any excluded party; and the judicial officers assigned to this case and their immediate families.

71. Plaintiff reserves the right to revise the Class definition by amendment or at class certification as discovery reveals new or different facts.

72. **Numerosity.** On information and belief, the Class numbers at least in the thousands, so joinder of all members is impracticable. Class size and membership can be determined from Kalahari's records, including the files affected by the Data Breach.

73. **Commonality.** Questions of law and fact common to the Class include:

(a) whether Kalahari owed Plaintiff and Class Members a duty to protect their PII;

(b) whether Kalahari was negligent in collecting and storing that information and thereby breached its duties;

(c) whether Plaintiff and Class Members are entitled to damages because of Kalahari's conduct; and

(d) whether Plaintiff and Class Members are entitled to restitution because of Kalahari's conduct.

74. **Typicality.** Plaintiff's claims are typical of the Class's claims. Plaintiff and every Class Member were Kalahari guests or employees whose PII was exposed to an unauthorized third party through the same conduct, and their claims rest on the same legal theories.

75. **Adequacy.** Plaintiff will fairly and adequately protect the Class's interests, has no interests adverse to the Class, and has retained counsel experienced in class action litigation.

76. **Predominance.** Common questions predominate over individual ones. The same practices, the same breach, and the same types of injury are at issue for every Class Member. If Kalahari breached its duty, Plaintiff and every Class Member were damaged by that breach.

77. **Superiority.** A class action is superior to other methods of resolving this controversy. It avoids duplicative individual suits, achieves economies of time, effort, and expense, promotes consistent decisions, and presents fewer management difficulties than separate litigation.

78. **Injunctive and Declaratory Relief.** Kalahari has acted or refused to act on grounds that apply generally to the Class, so injunctive and declaratory relief is appropriate for the Class as a whole under Rule 23(b)(2).

79. **Ascertainability.** The Class is defined by objective criteria, and its members can be readily identified from Kalahari's books and records.

## VI. CAUSES OF ACTION

### COUNT I
### Negligence and Negligence Per Se
### (On Behalf of Plaintiff and the Class)

80. Plaintiff references and reincorporates all preceding paragraphs as if fully set forth herein.

81. Plaintiff and Class Members gave Kalahari their PII as a condition of employment or of receiving its services.

82. By collecting and storing that information, Kalahari assumed a duty to use reasonable care to secure it and keep it from being compromised, lost, stolen, accessed, or misused by unauthorized parties. That duty included designing, maintaining, overseeing, and testing its security systems, consistent with industry standards, and ensuring that the personnel responsible for those systems protected the data.

83. Kalahari knew how sensitive the information was and what harm its guests and employees would suffer if it were disclosed. Kalahari also stood in a special relationship with its guests and employees, who entrusted their data on the understanding that Kalahari would take adequate precautions to protect it.

84. Kalahari knew or should have known of the risks of storing PII, the weaknesses in its own systems, and the many well-publicized data breaches in the years before the Data Breach.

85. Kalahari's duty of care arises under the common law independent of any contract. Kalahari also owed a duty to promptly and adequately notify Plaintiff and Class Members of the Data Breach, including how it happened and what data was taken, so they could act to prevent and mitigate identity theft and fraud.

86. Kalahari breached its duties by, among other things:

a. failing to adopt reasonable data security measures, practices, and protocols;

b. failing to implement security systems sufficient to protect Plaintiff's and Class Members' PII;

c. failing to secure its systems and exercise adequate oversight of its security protocols;

d. failing to implement adequate system and event monitoring;

e. retaining PII longer than reasonably necessary;

f. failing to comply with industry-standard data security practices; and

g. failing to timely disclose the nature of the Data Breach.

87. Kalahari's failures created conditions that made a foreseeable criminal intrusion possible. Plaintiff and Class Members did nothing to contribute to the Data Breach or the misuse of their data. Kalahari's conduct was especially unreasonable given the nature and volume of the PII it held.

88. Section 5 of the FTC Act, 15 U.S.C. § 45, independently required Kalahari to use reasonable measures to protect confidential data. Kalahari's violation of that statute constitutes negligence per se.

89. But for Kalahari's breaches, Plaintiff's and Class Members' PII would not have been compromised. Kalahari's failure to adopt and maintain appropriate security measures was the proximate cause of the loss and exposure of that information.

90. As a direct and proximate result of Kalahari's negligence and negligence per se, Plaintiff and Class Members have suffered and will suffer injury, including: (i) invasion and loss of privacy; (ii) lost or diminished value of their PII and loss of control over its use; (iii) theft and publication of their PII; (iv) out-of-pocket costs to prevent, detect, and recover from identity theft, tax fraud, and other misuse; (v) lost time and opportunity costs spent mitigating the Data Breach, including placing fraud alerts and credit freezes; (vi) loss of the benefit of the bargain; (vii) increased spam calls, texts, and emails; (viii) anxiety and emotional distress; and (ix) continued risk to their PII, which remains in Kalahari's possession, on information and belief unencrypted, and exposed to further breaches until Kalahari adopts adequate safeguards.

91. Plaintiff and Class Members are entitled to damages, declaratory and injunctive relief, and attorneys' fees, costs, and expenses.

**COUNT II**
**Breach of Implied Contract**
**(On Behalf of Plaintiff and the Class)**

92. Plaintiff references and reincorporates all preceding paragraphs as if fully set forth herein.

93. Kalahari required Plaintiff and Class Members to provide their PII, directly or indirectly, to obtain employment with, or services from, Kalahari. By providing it, and by Kalahari's acceptance of it for that purpose, the parties formed implied contracts.

94. Under those implied contracts, in exchange for consideration and their PII, Kalahari agreed to provide employment or services and to: (a) use the PII only for business purposes; (b) take reasonable steps to safeguard it; (c) prevent its unauthorized disclosure; (d) give prompt and

sufficient notice of any unauthorized access or theft; (e) retain it only under secure and confidential conditions; and (f) protect it in compliance with applicable laws, regulations, and industry standards.

95. Protection of PII was a material term of these agreements. The parties' mutual intent is shown by their conduct and course of dealing. On information and belief, Kalahari also adopted written privacy policies promising to disclose PII only in limited circumstances, none of which apply to the Data Breach, and promising to comply with industry standards in protecting that information.

96. Plaintiff and Class Members reasonably expected that Kalahari's data security complied with law and industry standards, and they would not have entrusted their PII to Kalahari without its implied promise to keep it reasonably secure and to monitor its systems accordingly.

97. Wisconsin law implies a duty of good faith and fair dealing in every contract.

98. Plaintiff and Class Members fully performed by providing their PII.

99. Kalahari breached the implied contracts by failing to implement and maintain reasonable security measures; failing to protect PII in compliance with law, regulation, and industry standards; continuing to accept and store PII after it knew or should have known of the vulnerabilities exploited in the Data Breach; failing to delete former guests' and employees' information after the relationship ended; and failing to give timely and accurate notice of the Data Breach.

100. Kalahari's breaches directly caused the Data Breach and Plaintiff's and Class Members' resulting injuries, including: (i) paying, directly or indirectly, for data security they did not receive and overpaying for services; (ii) a substantially increased risk of identity theft that warrants protective and remedial expenditures; (iii) unauthorized disclosure of their PII and breach

of its confidentiality; (iv) loss of the value of their PII, for which an established market exists; and (v) lost time and present and future mitigation costs.

101. Plaintiff and Class Members are entitled to compensatory, consequential, and nominal damages, and to injunctive relief requiring Kalahari to strengthen its data security and monitoring, submit to annual audits, and provide adequate credit monitoring to all Class Members.

**<u>COUNT III</u>**
**Unjust Enrichment**
**(On Behalf of Plaintiff and the Class)**

102. Plaintiff references and reincorporates all preceding paragraphs as if fully set forth herein, except those of Count II. This Count is pleaded in the alternative to Count II.

103. Plaintiff and Class Members conferred a benefit on Kalahari by providing their PII in connection with their employment or receipt of its services. Kalahari knew of that benefit, accepted and retained it, and used the PII for business purposes.

104. Before and when Plaintiff and Class Members provided their PII, Kalahari led them to reasonably believe it would keep the information secure, and it did not disclose the deficiencies and vulnerabilities in its information systems.

105. Part of the payments Kalahari received from its guests in the ordinary course of business was meant to cover the cost of reasonable data security. Similarly, the funds meant to cover adequate and reasonable data security for Kalahari's employees came from the employees themselves, who accepted less in compensation than they otherwise would have received. Instead of providing that security, Kalahari used inadequate, low-cost measures and kept the savings, increasing its profit at its guests' and employees' expense.

106. Because Kalahari failed to provide reasonable security, it was overpaid. Equity and good conscience do not permit Kalahari to retain the benefits Plaintiff and Class Members conferred.

107. Plaintiff and Class Members lack an adequate remedy at law.

108. As a direct and proximate result of Kalahari's conduct, Plaintiff and Class Members have suffered the injuries described in Paragraph 90.

109. Plaintiff and Class Members are entitled to restitution, refunds, or damages, and to an order disgorging Kalahari's profits and other benefits from its wrongful conduct, including through a constructive trust.

**COUNT IV**
**Declaratory Judgment, 28 U.S.C. §§ 2201 *et seq.***
**(On Behalf of Plaintiff and the Class)**

110. Plaintiff references and reincorporates all preceding paragraphs as if fully set forth herein.

111. The Declaratory Judgment Act authorizes this Court to declare the parties' rights and legal relations and to grant further necessary relief. The Court may also restrain tortious conduct of the kind alleged here.

112. An actual controversy exists over whether Kalahari's current data security is adequate to protect Plaintiff's and Class Members' PII from further breaches. Plaintiff alleges it is not. Plaintiff continues to suffer injury from the Data Breach and faces an imminent risk of further compromise.

113. Plaintiff asks the Court to declare that: (a) Kalahari owes a legal duty under the common law and applicable state statutes to secure its guests' and employees' PII and to timely notify affected individuals of a data breach; and (b) Kalahari continues to breach that duty by failing to use reasonable measures to secure the PII in its possession.

114. The Court should also enter a corresponding prospective injunction requiring Kalahari to use security protocols consistent with law and industry standards.

115. Without an injunction, Plaintiff will suffer irreparable injury and lack an adequate legal remedy if another breach occurs. The risk is real, immediate, and substantial, and many resulting injuries cannot be readily quantified.

116. The balance of hardships favors Plaintiff. Plaintiff faces substantial identity theft and other harm, while Kalahari's cost of complying with an injunction to use reasonable security is relatively minimal and is an obligation Kalahari already has.

117. An injunction serves the public interest by preventing another breach at Kalahari and the injuries it would cause to Kalahari's guests and employees.

## VII. PRAYER FOR RELIEF

Plaintiff, individually and on behalf of the Class, asks the Court to enter judgment against Kalahari and to award:

A. an order certifying the Class, appointing Plaintiff as Class representative, and appointing Plaintiff's counsel as Class counsel;

B. equitable relief barring Kalahari from continuing the wrongful conduct alleged, including the misuse or disclosure of Plaintiff's and Class Members' PII, and from withholding prompt, complete, and accurate disclosures;

C. equitable relief requiring Kalahari to adopt appropriate methods and policies for collecting, storing, and securing guest and employee data, and to disclose with specificity the types of PII compromised in the Data Breach;

D. restitution and disgorgement of revenues wrongfully retained;

E. an order requiring Kalahari to pay for at least ten years of credit monitoring for Plaintiff and Class Members;

F. actual, compensatory, and statutory damages and statutory penalties, in amounts to be determined, as permitted by law;

G. punitive damages as permitted by law;

H. attorneys' fees, costs, and expenses, including expert fees;

I. pre- and post-judgment interest; and

J. any other relief the Court deems just and proper.

## VIII. DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial on all issues so triable.

Dated: November 16, 2026

Respectfully submitted,

*/s/ Samuel J. Strauss*
Samuel J. Strauss
**STRAUSS BORRELLI PLLC**
One Magnificent Mile
980 N. Michigan Ave., Suite 1610
Chicago, IL 60611
Telephone: (872) 263-1100
Facsimile: (872) 263-1109
sam@straussborrelli.com

Andrew W. Ferich*
**AHDOOT & WOLFSON, PC**
201 King of Prussia Road, Suite 650
Radnor, PA 19087
Telephone: (310) 474-9111
aferich@ahdootwolfson.com

Scott J. Falgoust*
**BRYSON HARRIS SUCIU & DEMAY PLLC**
5301 Canal Boulevard
New Orleans, LA 70124
Telephone: (919) 585-5634
sfalgoust@brysonpllc.com

***pro hac vice forthcoming***

*Attorney for Plaintiff and the Proposed Class*